## Commonwealth *v.* Leyshon, Appellant (No. 1).

*Criminal law—Charge—Expression of opinion by trial judge—Conspiracy—Evidence—Cross-examination.*

1. Where on the trial of an indictment for conspiracy there is a radical contradiction in the testimony, the trial judge cannot be convicted of error in expressing an opinion on the evidence in a proper attempt to aid the jury, if he leaves the case to the jury to decide it according to their intelligence and conscience.

2. On the trial of an indictment for conspiracy where the evidence shows that at a particular time the conspiracy had been entirely exe-

cuted and its fruits gathered, the court commits no error in refusing to permit a witness to be questioned on cross-examination as to events occurring several days thereafter, where there is no offer of anything further to indicate why the witness should be so questioned.

*Criminal law—Evidence—Res gestæ—Bribery—Conspiracy.*

3. Where a witness in a criminal prosecution for conspiracy to violate the election laws testifies that he saw what he believed to be money, pass from the defendant to an election officer, he may be permitted to testify that within five minutes afterwards the officer exhibited money that he had received.

Argued Oct. 18, 1910.  Appeal Nos. 5 and 6, March T., 1911, by defendants, from judgment of Q. S. Lackawanna County, Dec. Sessions, 1908, No. 211, on verdict of guilty in case of Commonwealth v. Thomas Leyshon and Abram Howells.  Before RICE, P. J., HENDERSON, MORRISON, ORLADY, HEAD, BEAVER and PORTER, JJ.  Affirmed.

Indictment for conspiracy.  Before HEYDT, P. J., specially presiding.

The facts are stated in the opinion of the Superior Court.

At the trial John Mishler was asked this question:

"Q. Do you know how much money that was? A. After George showed me it was $10.00."

Judge Vosburg: We object to what George did afterwards in the absence of Thomas Leyshon.

The Court: Objection overruled.  Exception noted for defendants, at whose request a bill is sealed. [11]

Mr. Donahoe: "Q. Go on and tell us what George did with the money.  A. He showed me $10.00.  Q. Paper money?  A. Yes.  Q. Where was that, where were you then?  A. In the dining room.  Q. In the dining room of the same hotel?  A. Yes.  Q. How long after.  A. About five minutes."

CROSS-EXAMINATION.

Mr. Balentine: "Q. You saw Mr. Leyshon hand George something under the table at which you were drinking beer; is that correct?  You saw Leyshon's hand go under

the table? A. Yes. Q. You didn't see what he had in his hand? A. No, it was on the other side of the table. Q. It was a table about four feet in diameter, a round table, wasn't it? A. No. I guess about two feet and a half. Q. You were on one side? A. Yes. Q. Leyshon on one side? A. Yes, sir. Q. And George on one side? A. George was on the same side I was. Q. Leyshon puts his hand under the table? A. Yes, sir. Q. And George puts his hand under the table? A. Yes, sir. Q. There is not a word said between you and George or George and Tom? A. No, George just talked easy with Leyshon. Q. You heard nothing? A. No. Q. And about ten minutes later when you were in the dining room George showed you a ten dollar bill? A. Yes, sir. Q. That is all he said? A. Yes. Q. Just showed you a ten dollar bill? A. Yes. Q. He might have got that ten dollar bill before he came out of jail for all you know? A. I can't tell. Q. You don't know where he got it? A. I don't know."

A. B. Rutherford, a witness for the commonwealth, was asked this question:

"Q. Do you remember when this matter arose Mr. Nowyokot was brought down here and asked to make an affidavit that there was a change in the matter, of his saying at that time that there hadn't been any change and that he refused to make any affidavit?"

Mr. O'Brien: I object to that as immaterial and incompetent.

The Court: When was that?

Judge Vosburg: About the Saturday of election week.

The Court: Objection sustained. Exception noted for defendants at whose request a bill is sealed. [13]

The court charged in part as follows:

[I will now say something that perhaps would not go to the credibility of the witnesses for the defense. The question often arises why there is so much contrariety and contradiction in the testimony of witnesses to the same transaction. There are different ways of accounting for

it, and no hard and fast rules can be laid down. There are some persons corrupt enough to be willing to swear to anything; that number, fortunately, I believe to be few; I believe that most people when they go upon the witness stand mean to tell the truth; I am charitable enough to believe that; and my observation has been to that effect. But to go upon the witness stand and narrate and describe occurrences as they actually happened is a gift possessed by few persons. They either magnify certain parts which to them seem important and which, in fact, are not very important, or they distort or minimize others until their real significance is either totally or partially obscured. Then there is another element enters into the credibility of witnesses or for accounting for the differences, a matter which when I state it to you will seem familiar to you—you may never have heard it stated empirically or didactically—and that is this fact, the part that imagination plays in giving testimony. The average man thinks and is of the opinion that the imagination spends itself in writing poetry and writing fiction. That is a great mistake. In the order of time of development imagination precedes that of memory. When the average person sees the occurrence of a particular thing he sees the fact. What else does he do? He walks away and thinks about it, and he imagines what could have happened. He pays no more attention to it. In course of time that incident comes up, what happened at that particular time, and he remembers not only what he saw, but he remembers in the same connection what he imagines he saw or heard, and the average person cannot for the life of him tell what he actually heard or what he imagined he heard or what he heard somebody else say. And in the course of time that fixes itself upon his mind, and when he goes upon the witness stand and tries to narrate what took place he tells what he saw, and a great many tell what they imagine they saw, what they imagine they heard, with the same confidence as what they actually saw. They do not mean to lie, they do not mean

to perjure themselves. This, perhaps, is a psychological discussion of a matter which I did not intend to go into when I started. It may be more interesting than profitable, but it can do no harm.

In the same way a person's recollection at times is refreshed about an occurrence afterwards, and in time to come parties imagine that they themselves saw and heard certain things.] [4]

· Verdict of guilty, upon which judgment of sentence was passed. Defendant appealed.

*Errors assigned* were (4) portion of charge, quoting it; (11, 13) rulings on evidence, quoting the bill of exceptions.

*A. A. Vosburg* and *John F. Scragg*, with them *C. Balentine*, for appellants.

*Joseph O'Brien*, district attorney, with him *T. A. Donahoe*, assistant district attorney, for appellee.

OPINION BY HEAD, J., November 21, 1910:

The testimony upon which the commonwealth relied for the conviction of the defendants was chiefly circumstantial. The defendant, Leyshon, produced a number of witnesses whose evidence tended to establish for him an alibi. This testimony answered the legal requirements of evidence in such a case. That is to say, it accounted for the presence of the defendant elsewhere at the very time when, according to the testimony of the commonwealth, he was actively engaged in the execution of the alleged conspiracy. Had this evidence been accepted by the jury as credible in all of its details, it would have warranted the acquittal of the defendant.

There appeared then to be such a radical contradiction in the two lines of testimony that at first blush it might have seemed useless for the jury to try to reconcile them. The learned trial judge in his charge first adverted to the fact that as this testimony was delivered many months

after the happening of the occurrences, it might seem strange that the defendants' witnesses could so accurately recall the many details which appeared to give weight to their evidence. He suggested, however, that this might be explained in harmony with the truthfulness of the witnesses by the fact that informations leading to the arrest of the defendants had been made within a few days after the alleged occurrences and that this might naturally result in permanently lodging in the recollection of the witnesses matters then entirely recent and fresh in their memory.

This suggestion was certainly favorable to the defendant and it was offered by the learned trial judge as an aid to help the jury in accepting testimony which might otherwise arouse some suspicion in their minds because of its wealth of detail. He then proceeded to discuss this testimony generally from another standpoint and this portion of the charge constitutes the fourth assignment of error. In this discussion the learned judge pointed out, in an abstract way, the fact that even truthful witnesses do not see and describe alike an occurrence which they have actually witnessed. The nature of his discussion is well illustrated by the language with which he ends it, viz.: "This, perhaps, is a psychological discussion of a matter which I did not intend to go into when I started. It may be more interesting than profitable, but it can do no harm." The burthen of these remarks was again manifestly an effort on the part of the learned trial judge to give the jury still another viewpoint of the testimony with which they had to deal, in the hope that it also might be of aid in enabling them to reach a conclusion which would not necessarily involve the idea that witnesses, had testified to what they knew to be false.

Concerning the propriety or good taste of introducing such discussions into a charge to the jury in the trial of a criminal case we have no criticism to make. That is not our province. It is clear from a perusal of the entire charge that almost every line of it manifests the desire of the learned judge to submit the testimony on both sides

with the utmost fairness and in no way to invade the province of the jury in dealing with that evidence and determining for themselves the facts established by it. The language complained of, even regarded in its most unfavorable aspect, could hardly be considered more than an expression of opinion by the learned trial judge on the kind of evidence with which he was dealing. It has often been held that where, as the result of the whole charge, the evidence was fairly submitted to the jury and they were left free to deal with it according to their own intelligence and conscience, an expression of opinion by the trial judge is not reversible error. We are not convinced, after a careful examination of the entire charge, that any harm was done to the defendants by the use of the language complained of. The fourth assignment is overruled.

The thirteenth assignment complains of the action of the court in sustaining an objection made by the district attorney to a question asked of the witness Rutherford whilst being cross-examined by the defendants' counsel. The witness was the deputy prothonotary of the county who seems to have had special charge of election returns. His testimony in chief had tended to prove the time when the particular return alleged to have been falsified was delivered to him by the judge of election; and where and how this return had been kept in his office until it became an item of evidence in the courts. The cross-examination down to the point where the objection referred to was interposed had been germane to the direct one. The witness was then asked as to what was said or done in his presence or hearing on the Saturday following the counting of the votes when the judge of election was brought to the office of the witness. An objection to this was interposed and sustained and this constitutes the thirteenth assignment of error.

It is not apparent to us in the first place that this was proper cross-examination. If the question was relevant for the purpose of laying ground for contradiction of the witness, the record should so show. At the time referred

to in the question the conspiracy, if one ever existed, had been entirely executed and its fruits gathered. Without the offer of something further indicating why the witness should be permitted to answer the question, we are led to the conclusion that the learned judge was right in sustaining the objection. The thirteenth assignment is overruled.

The eleventh assignment complains of the action of the court in permitting the witness John Mishler to answer a question to which we shall advert. The district attorney had elicited from the witness that just after George Nowyokot, the judge of the election whose return was altered, had been convicted and sentenced, he, the witness, was in court or at the judges' chambers when bail was furnished for him pending an appeal. From there the witness, Leyshon, the defendant, and the convicted judge of election, went to a hotel together and sat at the same table. The witness testified that he there saw Leyshon, the defendant, hand to Nowyokot what he believed to be money or bills. The defendant then left and the witness was asked if Nowyokot then and there within a period, as he described it, of five minutes, exhibited what he received. Objection was interposed by the defendants' counsel, and it is the overruling of this objection and the admission of the witness's answer that constitute this eleventh assignment. His testimony as to the fact of something resembling money being handed over was admitted without objection. If that testimony was competent and relevant, the question objected to was certainly admissible as part of the res gestæ. The whole transaction occupied but a few moments. It certainly tended to show that some relation existed between the defendant and the convicted election officer, and in the absence of a satisfactory explanation would be a circumstance which the jury had a right to consider with all the other facts in the case. The assignment is overruled.

We have attentively considered all of the remaining sixteen assignments of error, but no possible good could re-

sult from a discussion of them separately. Whether we regard them singly, or in their proper relation to the entire record, we must conclude that they exhibit no reversible error. A review of the whole case satisfies us that the defendants had a fair and impartial trial, had the benefit of the assistance of able and most industrious counsel, and were accorded every substantial right guaranteed to them by the constitution and laws of the state. All of the assignments are therefore overruled.

The judgment is affirmed and the record remitted to the court below to the end that the sentence may be carried into execution. The costs of this appeal to be paid by the appellees.